Lyons v Sigma Mgt. Holdings, LLC (2024 NY Slip Op 51334(U))

[*1]

Lyons v Sigma Mgt. Holdings, LLC

2024 NY Slip Op 51334(U)

Decided on September 23, 2024

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 23, 2024
Supreme Court, New York County

John Lyons, Plaintiff,

against
Sigma Management Holdings, LLC, SAGEWIND CAPITAL LLC, Defendant.

Index No. 654360/2023

Plaintiffs by: 
Fleischman Bonner & Rocco LLP, 81 Main St Unit 515, White Plains, NY 10601.
Defendants by:
CLARICK, GUERON, AND REISBAUM LLP, 220 5th Ave, New York, NY 10001.

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59 were read on this motion to/for DISMISS.
Upon the foregoing documents, Sigma Management Holdings, LLC (the Buyer)'s motion to dismiss, the First Amended Complaint (the FAC; NYSCEF Doc. No. 12) is GRANTED.
Simply put, the FAC is predicated on the incorrect assertion that the Buyer failed to make payments when due and owing under the Note (hereinafter defined) and that there were not restrictions in a certain Senior Credit Agreement (hereinafter defined) preventing upstream distributions from Sigma Defense Systems LLC (Sigma Defense), the Buyer's subsidiary, to the Buyer and thus permitting the Buyer to defer payments until such restrictions were no longer in place pursuant to the express terms of the Note (NYSCEF Doc. No. 13 §5). This is expressly contradicted by the plain language of the Note and the Senior Credit Agreement (CPLR 3211[a][1]) which John Lyons (the Seller) was either aware of and otherwise chose not to do additional due diligence about as to an issue and an agreement that he was fully aware of before proceeding with the deal that he voluntarily entered into:
5. Payment Restrictions. Holder agrees, by his acceptance of this Note, for itself and each future holder of this Note or any portion hereof as follows:
(a) Notwithstanding anything to the contrary in this Note, the Borrower shall not be [*2]obligated to pay all or any portion of the amounts that are otherwise due under this Note (including principal and/or interest payments) if Sigma Defense is prohibited from making distributions to any direct or indirect parent of Sigma Defense under the provisions of the Senior Credit Agreement then in effect (if any). Once the prohibition is satisfied by Sigma Defense payments shall resume with accrued interest applied.
For purposes of this Note, "Senior Credit Agreement" means (i) the Credit and Guaranty Agreement, dated as of December 18, 2020 (as amended, restated, amended and restated, modified or supplemented from time to time, the "'Initial Senior Credit Agreement"), by and among Sigma Intermediate Holdings LLC, Sigma Defense, as the borrower, the subsidiaries of Sigma Defense party thereto from time to time, the lenders party thereto and PennantPark Loan Agency Servicing, LLC, as administrative agent and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness, obligations or liabilities or other financial accommodations that have been incurred to renew, refund, extend, replace or refinance, in whole or in part, any indebtedness, obligations or liabilities under the Initial Senior Credit Agreement or any subsequent Senior Credit Agreement with the same lenders under such Senior Credit Agreement or any other " institutional lender" (institutional lender means and includes a federall y chartered " national bank" or " national association", a state chartered " insurance company" or mutual insurance company, or state cha11ered bank, an investment banking entity or institution, or any other Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities, including any lender under the Senior Credit Agreement) other than any Affiliate of the Borrower), in each instance, as amended, restated, amended and restated, modified, supplemented, renewed, refunded, extended, restructured, replaced, increased or refinanced in whole or in part from time to time.
(b) The failure to make a payment of any amounts otherwise due and payable under this Note by reason of this Section 5 shall not constitute an Event of Default under Section 6 hereof
(NYSCEF Doc. No. 3 § 5). . . .
Section 5.4 Restricted Distributions: Payments of Subordinated Debt. No Credit Party shall, nor shall it permit any Subsidiary to, directly or indirectly, make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Debt (including, without limitation, the Subordinated Debt evidenced by the Closing Date Seller Note and any Earnout) except to the extent expressly permitted pursuant to the subordination terms thereof or, in the case of any Earnouts, to the extent permitted pursuant to Section 5.1(h)
(NYSCEF Doc. No. 27 § 5.4).
The FAC does not allege that either the Senior Credit Agreement itself is no longer in full force and effect or that the payment restrictions set forth in the Senior Credit Agreement are [*3]no longer in full force and effect. Thus, affording the Seller every favorable inference as the Court must at this stage of the litigation (Leon v Martinez, 84 NY2d, 87-88 [1994]), the payment is not yet due, and the breach of contract claim must be dismissed without prejudice as premature. 
The Buyer is also entitled to dismissal of the breach of the covenant of good faith and fair dealing claim because the FAC does not allege conduct that has deprived the Seller of the benefit of the contract that is independent and not duplicative of the conduct which forms the basis for the breach of contract claim. Indeed, the documentary evidence firmly establishes that the Seller received or will receive exactly what he bargained for — i.e., payment of the principal due and all accrued interest under the Note when the restrictions in the Senior Credit Agreement are no longer in effect (Gutierrez v Govt. Employees Ins. Co., 136 AD3d 975, 976 [2d Dept. 2016]).
Finally, the fraud claim too is ripe for dismissal because the FAC does not allege reasonable reliance. According to the FAC, Raj Kanodia, an employee of Sagewind Capital LLC (Sagewind), a private equity firm who includes the Buyer in its portfolio, indicated to the Seller that the Senior Credit Agreement did not prevent payment and that the Buyer was not and would not default under the Note. Significantly, according the FAC, when the Seller (as one would expect), asked for a copy of the Senior Credit Agreement to review it so that he could do his proper due diligence or elect not to go forward with the deal and retain his equity, Mr. Kanodia refused to let him have it (NYSCEF Doc. No.12 ¶ 50). He did the deal anyway. This matters and sounds the death knell for any reasonable reliance. For completion, the Court notes that even if this were not the case (i.e., that he was on notice of the very situation that he now finds himself in — i.e., having to wait and accrue interest until payment is due), the Note itself contains an integration clause such that reliance on any conversation outside of the agreement is manifestly unreasonably:
15. Entire Agreement. This Note contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.
(id., § 15). Thus, the fraud claim must be dismissed.
It is wholly irrelevant that the Buyer made some payments notwithstanding that the restrictions were in place because (i) such payments were voluntary and without obligation (i.e., which is permitted pursuant to the clear and unambiguous terms of the Note set forth above), (ii) the FAC does not allege an unequivocal manifestation of the relinquishment of known rights such that a waiver could be said to have occurred and (iii) the parties agreed that the rights of the Buyer could only be waived in writing which the FAC does not allege occurred:
9. Waiver. The rights and remedies of the parties under this Note shall be cumulative and not alternative. No waiver by either party of any right or remedy under this Note shall be effective unless in writing and signed by the party from whom such waiver is sought. Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege by either party will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right of either party arising out of this Note can be discharged by such party, in whole or in part, [*4]by a waiver or renunciation of the claim or right unless in a writing signed by such party; (b) no waiver that may be given by either party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on either party will be deemed to be a waiver of any obligation of such party or of the right of either party to take further action without notice or demand as provided in this Note. Borrower hereby waives presentment, protest, demand, notice of dishonor, and all other notices, and all defenses and pleas on the grounds of any extension or extensions of the time of payments or the due dates of this Note, in whole or in part, before or after maturity, with or without notice
(id., § 9).
THE RELEVANT FACTS AND CIRCUMSTANCES
Reference is made to (i) a certain Repurchase Agreement (the Repurchase Agreement; NYSCEF Doc. No. 25), dated August 21, 2022, by and among the Buyer and Seller, (ii) a certain Promissory Note (the Note; NYSCEF Doc No. 3), dated August 31, 2022, by and among the Seller and the Buyer pursuant to which the Seller agreed to accept $8,230,563.47 from the Buyer as part of the agreement for the Buyer's acquisition of the Seller's remaining capital units in Sigma Defense, (iii) a certain Credit and Guaranty Agreement (the Original Agreement; NYSCEF Doc. No. 8), dated December 18, 2020, as amended by a certain (b) First Amendment to Credit and Guaranty Agreement (the First Amendment; NYSCEF Doc. No. 9), dated as of December 21, 2020, (c) Second Amendment to Credit and Guaranty Agreement (the Second Amendment; NYSCEF Doc. No. 10), dated as of March 17, 2022, (d) Third Amendment to Credit and Guaranty Agreement (the Third Amendment; NYSCEF Doc. No. 11), dated as of May 15, 2023, and a (e) Fourth Amendment to the Credit and Guaranty Agreement (the Fourth Amendment; NYSCEF Doc. No. 53), dated December 4, 2023; the Original Agreement, together with the First Amendment, the Second Amendment, the Third Amendment, and the Fourth Amendment, collectively, hereinafter, the Senior Credit Agreement), each by and among, Sigma Defense, as the Borrower, Sigma Intermediate Holdings LLC, and The Subsidiaries of Sigma Defense from time to time party hereto, as Guarantors, PennantPark Investment Corporation, PennantPark Credit Opportunities Fund III, LP, PennantPark, PennantPark Floating Rate Funding I, LLC, PennantPark Floating Rate Capital LTD., PennantPark Senior Credit Fund Levered Funding, LLC, PennantPark Senior Credit Fund Levered, LP, PennantPark Senior Credit Fund, LLC, and Berkeley Road WC Funding SPV, LP, each as a Lender, and PennantPark Loan Agency Servicing, LLC, as Administrative Agent, (iv) a certain letter (the January 11th Default Notice; NYSCEF Doc. No. 4), dated January 11, 2023, a certain letter (the June 23rd Default Notice; NYSCEF Doc. No. 5), dated June 23, 2023, and a certain letter (the October 3rd Default Notice; NYSCEF Doc. No. 16), dated October 3, 2023.
This case involves the Seller's sale of his former company, Solute, Inc. (Solute), a technology and engineering firm that focused on providing digital modernization for the United States Department of Defense to the Buyer and the ultimate sale of his equity in Solute in a two-step transaction. In step one of the transaction, Solute merged into Sigma Defense (NYSCEF Doc. No. 12 ¶ 12). In step two, the Seller who had received shares in the Buyer, sold his shares pursuant to the Repurchase Agreement and the Note to the Buyer. The Buyer is the parent [*5]company of Sigma Defense and Sagewind is the ultimate parent of the Buyer (NYSCEF Doc. No. 12 ¶ 14).
More specifically, in December 2021, Sigma Defense acquired Solute from the Seller in a merger transaction pursuant to which Solute was merged into Sigma Defense. As part of the merger transaction, the Seller received 21,846.22 capital units in the Buyer's entity (i.e., as opposed to cash or a cash pay-out over a period of time as they could have agreed). In August 2022, several months after the first step of the transaction was consummated, the Buyer and Seller negotiated a deal for the repurchase of the Sellers' shares for $376.75 per unit or $8,230,563.47 pursuant to a Repurchase Agreement based on the terms and conditions set forth in the Repurchase Agreement and the Note. These documents reflect the business deal that the Buyer did not have to pay the Seller for these shares out of unrelated cash and only was required to pay him based on money that could be distributed from his former operating company, Solute, now merged into Sigma Defense. To wit, the parties agreed that if there were restrictions preventing upstream distributions to the Buyer who owes the Seller money, payment would be deferred until such restrictions were no longer in place.
Pursuant to the terms of the Note, the parties agreed that the Seller would receive 8% annual interest, default interest of 10%, and for a schedule of principal and interest payments over a three years period with the Note maturing on September 1, 2025 (NYSCEF Doc. No. 12 ¶ 17). Significantly, as it relates to this dispute, and as discussed above, the parties further agreed that the Buyer could defer scheduled payments until certain restrictions set forth in a Senior Credit Agreement did not prevent upstream distributions from Sigma Defense to the Buyer. 
Prior to executing the Note, when the Seller expressed certain concerns to Raj Kanodia of Sagewind that he might never be repaid, Mr. Kanodia is alleged to have said:
48 . Before executing the Note, Plaintiff, who was not then represented by counsel, emailed Defendant Sigma asking, among other things, for a copy of the Senior Credit Agreement that underlies the Note's "Payment Restrictions" provision. Plaintiff noted his concern that the Senior Credit Agreement could be written in such a way that the Note would never be repaid
49. Raj Kanodia, a Managing Director of Defendant Sagewind, called Plaintiff in response to Plaintiff's email, and assured Plaintiff that Defendant Sigma was nowhere near breaking any covenants, and further assured Plaintiff that there was no way any of those covenants, restricting payments under the Note, would be broken in the future
(id., ¶ 48-49).
Critically, however the Seller alleges that when he asked to review the Senior Credit Agreement, Mr. Kanodia refused and he nonetheless, and at his own peril, knowing that the Note itself provided both (i) that there was a Senior Credit Agreement and that because of restrictions in such Senior Credit Agreement, the time when he would be paid could be deferred and (ii) that he could not rely on any conversation outside of the Note because of the Note's integration clause, proceeded to sign and return the Note anyway:
50. Although Mr. Kanodia stated to Plaintiff that he could not share the Senior Credit Facility, he provided assurances to its content and that Sigma Defense was not in default [*6]and never would be. The record will show that Plaintiff signed and returned the promissory note a few minutes after this phone call was concluded
(id., ¶ 50).
Subsequently, the FAC alleges that the Buyer did not pay the amounts provided for in the Note for payment in December, 2022. In response, according to the FAC, the Seller sent the January 11th Default Letter demanding all amounts due.The very next day, Sigma Defense wired the money scheduled to be paid under the Note for December, 2022 albeit without penalty interest (NYSCEF Doc. No. 12 ¶ 22-27). The FAC then concedes that payment was timely made in March, 2023. Nonetheless, according to the FAC, the FAC alleges that the Seller sent the June 23rd Default Notice again demanding acceleration with all accrued interest (id., ¶ 32). In response, Sagewind explained that the "Payment Restrictions" provision in the Note meant that money was not due and no default had in fact occurred (id., ¶ 33). According to the FAC, subsequently, the Buyer did not then make the scheduled principal or interest payments due in September, 2023. In response, on October, 2023, the Seller sent the October 23rd Default Letter.Ultimately, the Seller sued. In the FAC, the Seller brings claims sounding in breach of contract (first count), fraud in the inducement (second count), and breach of the covenant of good faith and fair dealing (third count). 
DISCUSSION
On a motion to dismiss, the pleading is to be afforded a liberal construction and the court must accept the facts as alleged as true, according to plaintiffs the benefit of every possible inference, to determine whether the facts as alleged fit within any cognizable legal theory (Leon v Martinez, 84 NY2d, 87-88 [1994]). 
I. The Breach of Contract claim is expressly contradicted by the plain language of the Note.
According to the FAC, the Seller alleges that the Buyer breached the Note by failing to pay the scheduled interest payment due on December 31, 2022. According to the Seller, this default remains uncured because the Buyer never paid all amounts due under the Note. The argument fails. 
As discussed above, the CPLR 3211(a)(1) evidence unequivocally establishes that no payments were in fact due under the Note and that this lawsuit is premature. The Note is clear and unambiguous. It reflects an agreement between the parties pursuant to which the Buyer could defer making payments until certain conditions were satisfied — i.e., either sale of the business or until certain restrictions in a certain Senior Credit Agreement (which the parties agreed could be modified) were no longer in effect. To be clear, the Seller is compensated for the deferral of payment as it accrues healthy interest until it is paid in full. However, no default or breach has occurred and the FAC does not allege facts taken as true and affording every favorable inference indicating as such that is not utterly devoid of merit based on the Note and Senior Credit Agreement themselves. Thus, the breach of contract claim is dismissed.
Additionally, the Court notes that the facts alleged do not support a clear manifestation of the relinquishment of a known right or waiver or other basis not to enforce the waiver provision set forth in the Note which requires any waiver to be in a signed writing which the FAC does not [*7]allege occurred.
Lastly, to the extent that the Seller relies on an exception set forth in Section 5.4(a)(i) for distributions for certain purchases of capital stock, the argument also fails because the distributions at issue here are distributions for the payment of amounts due under the Note.
II. The Breach of Implied Covenant of Good Faith and Fair Dealing claim is dismissed
An implied covenant "is a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct" and "is not necessarily duplicative" of a contract claim (Gutierrez v Govt. Employees Ins. Co., 136 AD3d 975, 976 [2d Dept 2016]). "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff" (Aventine Inv. Mgmt., Inc. v Canadian Imperial Bank of Com., 265 AD2d 513, 513—14 [1st Dept 1999]). 
However, "a separate cause of action for breach of the covenant cannot be maintained where, as here, it is premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract" (Parlux Fragrances, LLC, 204 AD3d at 91—92 [1st Dept 2022]). Indeed, when damages sought for an implied covenant claim are "intrinsically tied to the damages allegedly resulting from a breach of contract claim," the implied covenant claim should be dismissed (see, e.g., MBIA Ins. Corp. v Merrill Lynch, 81 AD3d 419, 420 [1st Dept 2011] [dismissing claim]; Canstar v J.A. Jones Const. Co., 212 AD2d 452, 453 [1st Dept 1995] [same]). 
At bottom, and taking the allegations as true as the Court must at this stage of the litigation (Leon, 84 NY2d at 87-88.), the Seller got and is getting exactly what he bargained for — i.e., deferred payment and accrued interest to compensate him for the deferral of payment. To the extent that they Seller leans into the fact that certain assurances were made by Mr. Kanodia or that certain payments were in fact made, this too does not state a claim for breach of the covenant of good faith and fair dealing under the circumstances alleged. As discussed, given that Mr. Kenodia refused to provide the Seller with the Senior Credit Agreement and the Seller voluntarily chose to proceed with the deal anyway, there simply was no reasonable reliance that could be said to have occurred or actionable breach of the covenant of good faith and fair dealing by virtue of the fact that the Buyer caused payments to be made (and the Seller received the benefit of such payments) before the payments were in fact due. 
III. The Fraud Claim is dismissed
As discussed above, the Seller argues that he was misled into signing the Note by Mr. Kanodia. Putting aside that the statements attributed to Mr. Kanodia appear to be in fact true (i.e., the Buyer is not in default and no restrictions "prevent payment," they prohibit upstream distributions), the FAC itself explains that the Seller decided to do this deal anyway when he concedes that the Buyer refused to provide him with the Senior Credit Agreement. This matters because the Note itself refers to the specific Senior Credit Agreement at issue and gives him notice that restrictions could give the Buyer the right to defer payment (where he would accrue interest) and that he could not rely on any conversations that he had with Mr. Kanodia. As such, [*8]the allegations in the FAC undermines any reasonable reliance and the fraud claim must be dismissed. 
For the avoidance of doubt, the Court notes that Pludeman v N. Leasing Sys., Inc., 10 NY3d 486, 489 [2008]) does not change the result. The issues in this case do not involve facts in the exclusive possession of the defendants such that the pleading standard should be relaxed to permit discovery. Stated differently, the problem is not that the Seller is in the dark. The problem here is that the lights are on, the Seller sees the landscape but can not make out a claim for fraud based on facts that were known to the Seller when the Seller signed the Note and voluntarily elected to do the deal anyway knowing that he could be in the exact situation that he now finds himself.
Accordingly, it is hereby ORDERED that the motion to dismiss is granted without prejudice.
DATE 9/23/2024
ANDREW BORROK, J.S.C.